**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**November 2, 2023**

# In the Court of Appeals of Georgia

A23A0787. DEKALB COUNTY SCHOOL DISTRICT et al. v. DEKALB AGRICULTURE TECHNOLOGY AND ENVIRONMENT, INC. et al.

PIPKIN, Judge.

Various charter schools operating in DeKalb County (collectively "Appellees"[1]) sued the DeKalb County School District ("the DCSD" or "the District") and its board members (collectively "Appellants"[2]) alleging that Appellants have breached the charter schools' respective contracts in various ways and underfunded

---

[1] Appellees are DeKalb Agriculture Technology & Environment, Inc., DeKalb, Preparatory Academy Charter School, Inc., Leadership Preparatory Academy, Inc., Path Academy, Inc., Tapestry School, Inc., The GLOBE Academy, Inc., and Avondale Education Association.

[2] Appellants are the DeKalb County School District, Cheryl Watson-Harris, in her Official Capacity as Superintendent of DeKalb County School District, as well as Marshall D. Orson, Vickie B. Turner, Diijon Dacosta, Michael A. Erwin, Allyson Gevertz, Stan O. Jester, and Joyce Morley, in their Official Capacities as members of the DeKalb County Board of Education.

the schools. The trial court granted partial summary judgment to Appellees as to liability, and Appellants seek review of that decision. As we discuss below, this action is not barred by sovereign immunity; further, we see no reversible error with respect to the grant of summary judgment in favor of Appellees. Accordingly, we affirm the judgment of the trial court.

1. Appellees are seven charter schools authorized by both the DeKalb County Board of Education and Georgia Board of Education. In August 2020, Appellees filed suit for breach of contract against Appellants, arguing that Appellants had violated the express terms of their respective charter agreements, as well certain provisions of the Charter Schools Act of 1998 ("the Act" or "the Charter Schools Act"), see OCGA § 20-2-2060 et seq., that, according to Appellees, are incorporated into the charter agreement as a matter of law. Specifically, and as relevant here, Appellees' fourth amended complaint asserts as follows: Count I alleges that Appellants improperly reduced funding for certain schools below the contractually required amount; Count II alleges that Appellants failed to include Appellees in allocations of federal funding as required by OCGA § 20-2-2068.1 (c); Count IV alleges that Appellants improperly withheld an administrative fee from funding allocations under OCGA § 20-2-2068.1 (c.2); Count V alleges that Appellants failed to properly calculate and allocate

2

austerity restoration in accordance with OCGA § 20-2-2068.1 (b) and (c); and, Count VI alleges that Appellants failed to hold certain charter schools harmless from negative midterm funding adjustments consistent with OCGA § 20-2-162 (a).[3] The parties subsequently filed competing motions for summary judgment; Appellees sought summary judgment as to liability on each claim -- and to have the issue of damages reserved for the jury -- while Appellants asserted that all claims were barred by sovereign immunity and, alternatively, that Appellees had failed to demonstrate a genuine issue of material fact as to each claim.

Relying on our decision in *Cobb County School Dist. v. Learning Center Foundation of Central Cobb, Inc.,* 348 Ga. App. 66, 68-69 (821 SE2d 127) (2018) (physical precedent only), the trial court concluded, as a preliminary matter, that Appellees' action sounded in contract and, thus, was not barred by sovereign immunity. As to the merits of Appellees' claims, the trial court concluded that there was no evidentiary dispute that Appellants had breached the charter agreements by failing to fund certain charter schools at or above their intended funding floors; by failing to allocate federal funds to the charter schools; by improperly retaining fees for administrative services; by withholding austerity restoration funds to which

---

[3]All references to "the complaint" are to Appellees' fourth amended complaint.

Appellees were entitled; and by failing to hold the charter schools harmless for negative midyear adjustments. Appellants now challenge these rulings on appeal.[4]

Before addressing the parties' arguments, we first turn to our well-known standard of review applicable in this appeal: "Summary judgment is warranted when any material fact is undisputed, as shown by the pleadings and record evidence, and this fact entitles the moving party to judgment as a matter of law." *Strength v. Lovett*, 311 Ga. App. 35, 39 (2) (714 SE2d 723) (2011). On appeal from the grant of summary judgment, we apply a de novo standard of review. See *Latson v. Boaz*, 278 Ga. 113, 113 (598 SE2d 485) (2004).

Additionally, this appeal requires us to review and interpret a number of statutory provisions. As we do this, we keep in mind that "we must afford the statutory text its 'plain and ordinary meaning,' we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." (Citations

---

[4] There are two additional counts in the complaint that are not part of this appeal. In Count III, Appellees alleged that the District has failed to provide E-SPLOST funds to the charter schools; the trial court granted summary judgment in favor of Appellants as to that claim, and this ruling has not been appealed. In Count VII, Appellees alleged that Appellants have breached the implied covenant of good faith and fair dealing; there is also nothing before this Court regarding this claim.

omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). "[F]or context, we may look to other provisions of the same statute, [and] the structure and history of the whole statute[.]" (Citation and punctuation omitted.) *Thornton v. State*, 310 Ga. 460, 462 (2) (851 SE2d 564) (2020). Where the statutory text is "clear and unambiguous," we attribute to the statute its plain meaning, and our search for statutory meaning generally ends. See *Deal v. Coleman*, 294 Ga. at 173 (1) (a). With these principles in mind, we turn to Appellants' enumerations of error.

2. In two enumerations of error, Appellants claim that *Learning Center* was wrongly decided and that they are entitled to sovereign immunity. We disagree.

Generally speaking, "sovereign immunity extends to the state and all of its departments and agencies," Ga. Const. of 1983 Art. 1, Sec. II, Par. IX (e), which includes both the District and its board members. See, e.g., *Cook v. Smith*, 349 Ga. App. 16, 17-18 (3) (825 SE2d 439) (2019). Sovereign immunity bars tort actions against Appellants, see, e.g., *Parr v. Cook County School Dist.*, 359 Ga. App. 823, 824-825 (1) (860 SE2d 114) (2021), but the defense of sovereign immunity has been "waived as to any action ex contractu for the breach of any written contract." See Ga. Const. Art. I, Sec. II, Para. IX (c); OCGA § 50-21-1 (a). The question presented here is whether Appellees' claims that arise from the alleged violation of the Charter

5

Schools Act sound in tort or in contract. We agree with the trial court that such claims sound in contract and, thus, are not barred by sovereign immunity.

Under the Charter Schools Act, a "charter" is defined as

a performance based *contract* between a local board and a charter petitioner, the terms of which are approved by the local board and by the state board in the case of a local charter school; between the state board and a charter petitioner, the terms of which are approved by the state board in the case of a state chartered special school; or between a local board and the state board, the terms of which are approved by the state board in the case of a charter system. *By entering into a charter, a charter petitioner and local board shall be deemed to have agreed to be bound to all the provisions of [the Charter Schools Act of 1998] as if such terms were set forth in the charter.*

(Emphasis supplied.) OCGA § 20-2-2062 (1).

The plain language of this provision establishes that a "charter" is, in fact, a "contract," and, further, that the parties, by entering into a contract, "*agree* to be *bound* to all provisions of [the Charter Schools Act of 1998] as if such terms *were set forth in the charter*." Id. As Judge Gobeil correctly explained in *Learning Center*,

[t]he plain language of the [Charter Schools] Act does more than recite that the parties to a charter are bound by the Act. It essentially creates the basic terms of a charter agreement by stating that the parties to a charter "agree to be bound" "as if" the provisions of the Act were replicated word-for-word in the charter agreement. The provisions of the Act are part of the core of any charter agreement and part of the consideration exchanged between the parties.

6

348 Ga. App. at 69 (physical precedent only).[5] The language does not, as Appellants contend,[6] merely reflect that any charter agreement will be "governed by the Act, " but, instead, by its express language, OCGA § 20-2-2062 (1) incorporates the provisions of the Charter Schools Act of 1988 into the charter agreements themselves. Accordingly, Appellees claims -- which arise out of Appellees' alleged failure to

[5] Although *Learning Center* is not binding precedent, we nevertheless find its reasoning persuasive. See Court of Appeals Rule 33.2 (a) (2) (explaining physical precedent and noting that such decisions are "citable as persuasive, but not binding, authority"). See also *Pechin v. Lowder*, 290 Ga. App. 203, 205 (659 SE2d 430) (2008) ("[P]hysical precedent may be cited as persuasive authority, just as foreign case law or learned treatises may be persuasive.") (citation and punctuation omitted).

[6] Appellants contend that the words "such terms" in the phrase "as if such terms were set forth in the charter" speaks "to the agreement deemed to exist between the parties to the charter and that the charter will be governed by the Act." But such a reading of the statute is strained at best. Under Appellant's interpretation, the statute would advise the charter parties that, by entering into a charter, they would be "deemed to have agreed to be bound to all the provisions of [the Act] as if ['*the agreement deemed to exist between the parties to the charter*'] were set forth in the charter." Put another way, reading the phrase "such terms" to mean "the terms of the charter contract" -- rather than terms of the Act -- would, in effect, provide that the parties were bound by the terms of the Charter, "as if [they] were set forth in the Charter," which is redundant. Because this interpretation is inconsistent with a natural reading of the language, we reject it.

7

abide by both the charter agreement and various provisions of the Act -- sound in contract and, thus, are not barred by sovereign immunity.[7]

3. In a three-sentence paragraph under the heading "Enumeration of Error #2," Appellants generally assert that the phrase "no less favorably" -- which is used in numerous provisions of the Charter Schools Act and the respective memorialized charter agreements, see, e.g., OCGA § 20-2-2068.1 (a), (c), (d) (7), and (f) -- is "too vague" to create an enforceable contract. However, our ability to review any alleged error in this regard is hampered by Appellants' deficient brief. This enumeration is supported by three citations to general propositions of contract law and by a single sentence of "argument," which states as follows: "Where, as here, Appellees rely on the vague, undefined, and indefinite language, 'no less favorably,' there can be no

---

[7] In their final enumeration of error, Appellants assert that the DCSD board members and its superintendent "should be dismissed from this case." In support of this enumeration, Appellants cite two cases for general principles of the law related to sovereign immunity and assert, in total, as follows: "Official capacity claims against public employees are tantamount to suing a public subdivision. Further, the individual defendants were not parties to any of the Charters. Therefore, there is no cognizable claim against the individuals as Applicants [sic]." As we have explained, "[m]ere conclusory statements are not the type of meaningful argument contemplated by our rules." *Farmer v. Dept. of Corr.*, 346 Ga. App. 387, 394 (2) (816 SE2d 376) (2018). This enumeration -- which is unsupported by meaningful argument, citations to the record, or meaningful citation of authority -- fails to comply with our rules, and it is deemed abandoned. See Court of Appeals Rule 25 (d) (1).

8

meeting of the minds as to any agreement on that term." Notably, Appellants have failed to identify any specific context in which the phrase is too indeterminate.

It is well settled that "[i]t is not this court's role to speculate about the legal basis for an appellant's argument, and mere conclusory statements are not the type of meaningful argument contemplated by our rules." *Lundy v. Hancock County*, 268 Ga. App. 772, 781 (9) (a) (890 SE2d 92) (2023). Indeed, as we have previously explained, vague assertions of error are not entitled to appellate review because "it is not this Court's job to cull the record on behalf of Appellant to find alleged errors, as appellate judges are not like pigs, hunting for truffles buried in briefs." (Citations and punctuation omitted.) *McDaniel v. State*, 367 Ga. App. 376, 379 (d) (885 SE2d 245) (2023). Accordingly, this enumeration is deemed abandoned. See Court of Appeals Rule 25 (d) (1).

4. Appellants contend that the trial court erred in granting summary judgment to Appellees on Count I of the fourth amended complaint. In that count, Appellees assert that, with respect to four charter schools,[8] Appellants had "breached their duties under the renewed charter contracts" by "reducing state and local funding for FY21

_____

[8] The relevant charter schools are Tapestry, GLOBE Academy, PATH Academy, and DeKalb Preparatory Academy.

below the base rate set forth in [the respective] Charter Contracts." The relevant contractual provision, known as paragraph "15 (c)", is materially identical in each charter (except for the dollar amount), and it provides as follows:

> The Local Board shall fund the Charter School no less favorably than other local schools located within the school system unless otherwise provided by law. The base per-pupil funding amount in the Local Board-approved petition budget is the school system's good-faith estimate for the charter term. Based on these estimates, the Local Board shall fund the Charter School at no less than a per-pupil base rate of [relevant dollar amount] as long as the school system receives state and local revenues upon which the approved school budget is based.[9]

In its order, the trial court concluded that the language in paragraph 15 (c) -- which uses the terms "shall" and "no less" -- unambiguously imposes on the DCSD a per-pupil funding floor for each of the relevant schools; the trial court also determined that the DCSD indisputably failed to fund the schools during the 2021 fiscal year in accordance with this provision despite receiving "more state and local revenues that year than the revenues on which [the relevant schools] based their approved charter petition budgets."

---

[9] By way of explanation, the phrase "upon which the approved school budget is based" refers to a "petition budget" that the local board approves. According to Appellees, a "petition budget" is a budget submitted by a charter school with its charter renewal petition and precedes the execution of the charter contract; the petition budget is based on revenues existing at the time of the petition because the charter school petitions are due the year before renewal actually occurs.

10

Appellants do not specifically address the trial court's ruling here; instead, they have simply replicated the arguments raised in their motion for summary judgment in this regard. That said, Appellants first contend that paragraph 15 (c) "clearly creates a condition precedent that must be met before a charter school is arguably entitled to be funded at, or above the stated per-pupil rate." Relying solely on emails from the Georgia Department of Education, Appellants assert that "the actual funding level may fluctuate below or above the stated per-pupil base rate in paragraph 15 (c) depending on the level of funding actually allocated or received through state QBE and local funding." However, Appellants do not claim that paragraph 15 (c) is ambiguous -- indeed, they seem to agree with the trial court's conclusion that the language of paragraph 15 (c) is, in fact, unambiguous -- and, under such circumstances, these emails concerning the possible meaning of paragraph 15 (c) are immaterial parol evidence. See *UniFund Financial Corp. v. Donaghue*, 288 Ga. App. 81, 82-83 (653 SE2d 513) (2007). Aside from these emails, Appellants offer no interpretation or analysis of paragraph 15 (c).

Nevertheless, even if we were to agree with Appellants that the last phrase of paragraph 15 (c) creates a condition precedent relevant to the charter schools being funded at the relevant per-pupil rate, Appellants point to no evidence suggesting that

this condition precedent was not, in fact, satisfied. While Appellants assert that there was an austerity cut in fiscal year 2021 that was not fully restored and that "local funding ended up being lower than what was budgeted," none of these factual assertions are supported by citation to the record, and it is not the responsibility of this Court to cull the voluminous record on their behalf.[10] See *Brock v. Atlanta Airlines Terminal Corp.*, 359 Ga. App. 226, 227 (857 SE2d 74) (2021). Further, these assertions alone do not establish that the DCSD did not "receive[] state and local revenues *upon which the approved school budget is based*." (Emphasis supplied.) Instead, our review of the record -- which, again, was unaided by Appellants' brief -- appears to support the trial court's conclusion that, even with the austerity cuts, Appellants "received more state and local revenues that year than the revenues on which [the charter schools] based their approved charter petition budgets." Accordingly, the trial court correctly granted summary judgment to Appellees with respect to the funding-floor claims.

---

[10] The record before this Court includes approximately 11,000 pages over 30 volumes. As with other such instances in this appeal, if we have missed something in the record or misconstrued an argument, the responsibility rests with counsel. See *Stewart v. Johnson*, 358 Ga. App. 813, 814 (856 SE2d 401) (2021).

5. We next turn to Appellants' assertion that the trial court erroneously granted summary judgment to Appellees on Count II of the fourth amended complaint. In that count, Appellees allege that Appellants breached the various charter agreements "by refusing to provide [the charter schools] with IDEA [Individuals with Disabilities Education Act ] funding and Title IIA [of the Elementary and Secondary Education Act ] funding," as well as by "treating [the charter schools] less favorably than their non-charter counterparts." In granting summary judgment to Appellees on this claim, the trial court looked at various provisions of the Charter Schools Act that control the distribution of federal funds and concluded that Appellants were unequivocally required to disburse federal funds to the charter schools but had indisputably failed to do so. Now, on appeal, Appellants claim that Appellees' reading of the statute is incorrect and, further, that the District has been providing funds through in-kind services. There is no merit to these arguments.

Under the Charter Schools Act, "[a] local charter school shall be included in the allotment of . . . applicable federal grants to the local school system in which the local charter school is located," OCGA § 20-2-2068.1 (a), and "applicable federal grants earned by a local charter school shall be distributed to the local charter school *by the local board*." (Emphasis supplied.) Id. at (b). As to federal funds, the 2012

13

version of the Act -- which was in effect until 2017[11] -- provided even further instruction, stating as follows:

> In all other fiscal matters, including applicable federal allotments, the local board shall treat the local start-up charter school no less favorably than other local schools located within the applicable school system *and shall calculate and distribute the funding for the start-up charter school on the basis of its actual or projected enrollment in the current school year according to an enrollment counting procedure or projection method stipulated in the terms of the charter.*

(Emphasis supplied.) OCGA § 20-2-2068.1 (c) (2012). Effective July 1, 2017, the statute was amended as follows:

> *The Department of Education shall implement procedures that ensure that each local charter school receives from its local school system the proportionate amount of federal funds* for which such local charter school is eligible under each federal program, including but not limited to funds earned pursuant to Title I, Title II, and Title III of the federal Elementary and Secondary Education Act and pursuant to the federal Individuals with Disabilities Education Act. The local school system shall distribute funds to a local start up charter school; provided, however, that *by agreement between the local school system and the local start up charter school, the proportionate amount of federal funds for which the local start up charter school is eligible may be provided through the provision of in kind services by the local school system.*

---

[11] Though it varies by school, Appellees are generally seeking to recover funds from fiscal year 2016 through fiscal year 2022.

14

(Emphasis supplied.) OCGA § 20-2-2068.1 (c) (2017).[12] The trial court's conclusion is consistent with the plain language of these provisions -- no matter the relevant version -- and the court correctly determined that the DCSD was required to "calculate and distribute" the relevant "federal allotments" to the charter schools.

Appellants claim on appeal that the 2012 version of OCGA § 20-2-2068.1 (c) requires "an enrollment counting procedure or projection method" in order to distribute funds, but they assert that no such provision was included in the relevant charters. As an initial matter, implicit in this argument is an acknowledgment that the DCSD was, in fact, responsible for distributing federal funds. As to their argument, DCSD does not explain how the absence of a "counting procedure" in the school charters excuses the District from distributing federal allocations, as required by numerous provisions of the Charter Schools Act.[13]

Likewise, while Appellants assert that the July 2017 version of the statute imposes a duty on the Georgia Department of Education "*to determine* the amount of federal funding to be allocated," the plain language of the statute requires no such

_____

[12] This version remained in effect through June 30, 2021, after which the reference to Department of Education was removed from the above-quoted language. See Ga. L. 2021, p. 256, § 6.

[13] Appellants do not argue that performance under the contract was impossible.

15

thing. Instead, the statute requires only that the Georgia Department of Education "implement procedures that *ensure* that each local charter school receives *from its local school system* the proportionate amount of federal funds to which such local charter school is eligible under each federal program." (Emphasis supplied) OCGA § 20-2-2068.1 (c) (2017). Thus, while it may once have been the duty of the Georgia Department of Education to perform some oversight to assure that local school systems distribute the relevant federal funds, this responsibility does not alter the statutory obligations of a local school district to *distribute* the funds; indeed, the relevant statutory provisions are replete with language delegating this obligation to local school systems. See, e.g., OCGA § 20-2-2068.1 (a) and (b) (2017).

Appellants also point to the provision of the 2017 version of OCGA § 20-2-2068.1 (c), which, as quoted above, provides that, "by agreement between the local school system and the local start up charter school, the proportionate amount of federal funds for which the local start up charter school is eligible may be provided through the provision of in kind services by the local school system." Appellants contend that, in accordance with this language, Appellees accepted in-kind services in various years and, thus, that there is a fact question as to whether there was an

agreement for in-kind services in lieu of federal funds. The record does not support this argument.

As an initial matter, the evidence shows that neither party believed there was an agreement in this regard. Appellees disputed the existence of any agreement, and Appellants, in their response to Appellees' statement of undisputed material facts, acknowledged that they were "unaware of any express written agreement in which [Appellees] ha[d] agreed to receive in-kind services . . . instead of [federal] funding" but simply claimed that there was no evidence Appellees "had refused to accept the offer of in-kind services." Indeed, Masana Mailliard, the Chief Financial Officer and corporate designee for the District, testified specifically that she was unaware of any such agreement between the District and the charter schools.

Moreover, even assuming that there is evidence that Appellees accepted in-kind services and that such acceptance may be construed as an agreement, Appellants do not point to any evidence -- indeed, they do not even argue -- that the in-kind services satisfied the additional statutory requirement that such services be "*proportionate* [to the] amount of federal funds for which the local start up charter school [was] eligible." OCGA § 20-2-2068.1 (c) (2017). Accordingly, Appellants'

arguments fail, and the trial court properly granted summary judgment to Appellees on their claim regarding federal funding.

6. Appellants next claim that the trial court erred by granting summary judgment to Appellees on Count IV of the fourth amended complaint. In that count, Appellees alleged that "DCSD has withheld three percent of [their] allocations of state and local revenues as an 'administrative fee' or a 'management fee'" without having "actually provided" administrative services to the charter schools or accounting for the withheld funds. The relevant statutory provision, OCGA § 20-2-2068.1 (c.2), provides that

> the local board of education may retain an amount of the charter school's per pupil share of state and local funding not to exceed 3 percent of the total funds earned by the charter school to reimburse the local school system for administrative services actually provided to the charter school.

After looking at the plain language of the statute, the trial court concluded that OCGA § 20-2-2068.1 (c.2) only permits DCSD to retain funds sufficient to reimburse that which was expended by the District. The trial court then determined that the evidence indisputably showed DCSD had been withholding the maximum amount for administrative services without accounting for services actually provided. Thus, the

trial court concluded, Appellees were entitled to summary judgment as a matter of law on their claim.

On appeal, Appellants do not address the trial court's decision in this regard. Instead, they merely repeat the arguments raised in their motion for summary judgment, namely, that the phrase "administrative services" is undefined; that the evidence is undisputed that the DCSD has "provided a variety of administrative services to Appellees and incurred expenses" as a result; that any Georgia Department of Education regulation concerning the collection of administrative fees was not controlling; and that, because the General Assembly did not include the words "itemize," "itemized," or "itemizing," the legislature did not "intend[] to require the District to itemize the cost or value of each and every occasion or type of support provided to charter schools and/or time spent internally at the District addressing charter school matters."

None of Appellants' arguments undermine the trial court's ultimate conclusion about the relevant statute or undisputed evidence in the record. More to the point, the trial court's conclusion was sound. The plain text of OCGA § 20-2-2068.1 (c.2) permits the DCSD to withhold funds to *reimburse* the District for administrative services *actually provided* to the charter schools. Put another way, the District was

19

only entitled to a "refund" or "*repayment . . .* for expense or loss incurred" on account of the charter schools. (Emphasis supplied) Random House Webster's Unabridged Dictionary 1625 (2nd ed. 1997). It is of no consequence that the statutory provision does not expressly require a local school board to "itemize" its withheld funds. Under the statute, the local board of education may only withhold funds to reimburse itself -- that is "to pay [itself] back (money)," New World Dictionary of American English 1131 (3rd College ed. 1988) -- which can only be accomplished with some manner of accounting of actual expenditures; there is no evidence that the District was abiding by these requirements. Accordingly, the trial court correctly concluded that Appellees were entitled to judgment as a matter of law as to this claim, and this enumeration is without merit.

7. We now address Appellants' contention that the trial court erred in granting summary judgment to Appellees on Count V of the fourth amended complaint, in which Appellees allege that Appellants breached the terms of the respective charters by "failing to pass on to [Appellees] the austerity restoration that [Appellants] received in FY 21."

There is no dispute that, at the beginning of fiscal year 2021, the District's "state funding was cut by approximately $54 million due to austerity cuts," and,

20

consequently, that Appellees' overall funding was reduced; later, however, approximately $33 million of that cut was restored. In its order granting summary judgment to Appellees on this claim, the trial court determined that the evidence, when properly construed, showed that Appellants had received the austerity restoration in March 2021 but that, despite demands from Appellees, the charter schools' funding calculations were not adjusted during fiscal year 2021 to account for the restoration; the trial court determined that the funds had instead been deposited in the District's general fund. The trial court concluded, as a matter of law, that Appellees were entitled to a proportionate share of the restored funding and that Appellants had breached the charter agreements by withholding those funds.[14]

In a cursory appellate argument, Appellants claim only that Appellees have confused budgeted revenues with actual revenues. More specifically, Appellants

---

[14] The trial court also concluded that Appellees were entitled to a judgment as a matter of law because Appellants had treated Appellees "'less favorably' than other public schools in the district that did receive the full benefit of austerity restoration." While one of Appellants' earlier enumerations asserts a general one-sentence challenge to the phrase "no less favorably," Appellants do not actually address its application by the trial court as an alternative basis for granting summary judgment as to this count. "Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct." *Brown v. Fokes Properties 2002, Inc.*, 283 Ga. 231, 233 (2) (657 SE2d 820) (2008). We nevertheless address this enumeration.

21

contest the date on which the austerity restoration funds were *actually* received by the District and, thus, when those funds were available to be provided to Appellees. This argument is unavailing.

As a threshold matter, Appellants do not appear to contest -- in fact, their argument implicitly acknowledges -- that Appellees were indeed entitled to a proportional share of the austerity restoration. As to their arguments on appeal, Appellants claim the record shows that "[t]he District did not receive a restoration of the austerity cut until April 2022" and that, ultimately, the austerity restorations have been "shared with Appellees." However, these evidentiary claims stem from an affidavit provided by the District's chief financial officer that the trial court expressly rejected under the *Prophecy*[15] rule. The trial court concluded that the affidavit directly contradicted her earlier deposition testimony concerning the timing and treatment of the austerity funds. Notably, Appellants do not address or challenge this adverse ruling on appeal, which is fatal to their argument. Further, our review of the record -- which was, again, unaided by Appellants' brief -- reflects that the trial court's ruling under *Prophecy* was not clearly erroneous, see *Cottingham v. Sapp*, 344 Ga. App.

---

[15] *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986).

651, 653 (2) (811 SE2d 442) (2018), and that the trial court properly awarded summary judgment to Appellees on this claim. Accordingly, there is no merit to this enumeration.

8. Finally, we address Appellants' contention that the trial court erroneously granted summary judgment to Appellees on Count VI of the amended complaint. There is no reversible error.

Pursuant to OCGA § 20-2-162 (a), which is part of the Quality Basic Education Act, see OCGA § 20-2-130 et seq., the State Board of Education makes midterm recalculations to determine the total funds needed by each local school system under the Quality Basic Education ("QBE") Formula. Id. In the event that enrollment numbers rise in the school system, the State Board of Education increases funding for that local school system for that year. If, however, enrollment numbers decease, the funding for the school system is not reduced for that year; the parties refer to this practice as being "held harmless." In Count VI of their complaint, Appellees allege that, "[i]f DCSD's enrollment numbers decrease during the course of the school year, DCSD is 'held harmless' from corresponding funding decreases," but that the District

failed to hold certain charter schools[16] "harmless from negative midterm adjustments, thereby treating [the charter schools] less favorably than other non-charter schools."

As relevant to this appeal, the trial court articulated two bases for granting summary judgment to Appellees on this claim. First, the trial court explained that OCGA § 20-2-2068.1 (a) mandates that charter schools be included in both the "allotment of QBE formula earnings" and "applicable QBE grants," and the trial court reasoned that, because OCGA § 20-2-162 (a) is a mid-term recalculation of the QBE, the "hold harmless" provision of that statute applies to charter schools. Second, the trial court also concluded that Appellants had "never asserted that they withdr[e]w funding from non-charter local schools following the midterm [recalculations] as [Appellants had] done to [the charter schools]" and had thus "violated the Charter Schools Act's mandate of 'no less favorable' treatment.'"[17] As with their other arguments, Appellants do not squarely address the trial court's ruling. While we agree

[16] This count only applies to three charter schools: Tapestry Charter School, PATH Academy, and Leadership Preparatory Academy. Further, it also only relates to fiscal year 2021.

[17] The trial court also determined that specific language in the schools' charter agreements -- which addresses the use of "surplus funds remaining at the close of each fiscal year" -- would be rendered meaningless if the District could withdraw funds from the charter schools midterm. Given our holding, we need not address this conclusion.

with Appellants that OCGA § 20-2-162 (a) does not apply to Appellees -- and, thus, that summary judgment was wrongly awarded to Appellees on that basis -- we also conclude that the trial court's ruling may be upheld on its alternative basis.

We first address Appellants' contention that OCGA § 20-2-162 (a) does not apply to the charter schools. We start by looking at OCGA § 20-2-2068.1 (a), which provides that "local charter schools shall be included in the allotment of *QBE formula earnings [and] applicable QBE grants* . . . located under [the Quality Basic Education Act]." (Emphasis supplied.) While Appellees contend that this language broadly incorporates QBE-related statutes into the Charter Schools Act, the plain language of the Charter Schools Act belies such a assertion. The phrase "QBE formula earnings" is actually defined by the Charters Schools Act, something that neither the parties nor the trial court have noted. As detailed in the Charter Schools Act, "'QBE formula earnings,'means funds earned for the Quality Basic Education Formula *pursuant to Code Section 20-2-161*, including the portion of such funds that are calculated as the local five mill share in accordance with Code Section 20-2-164." (Emphasis supplied). OCGA § 20-2-2062 (12).[18] Thus, the phrase "QBE formula earnings" in OCGA § 202-2068.1 (a) refers *only* to OCGA § 20-2-161 and OCGA §

---

[18] This definition has remained materially unchanged for nearly two decades.

20-2-164 with no mention of OCGA § 20-2-162.[19] Though the other phrase, "QBE grant," is not defined, there is no indication that this phrase means or encompasses *a midterm recalculation of QBE funding*, rather than other grant monies specifically discussed in the Quality Basic Education Act. See OCGA § 20-2-165 (equalization grants). Thus, we agree with Appellants that the trial court's legal conclusion was erroneous in this regard.

That said, the trial court also granted summary judgment after determining that Appellants had failed to treat the charter schools "no less favorably" than non-charter schools. Aside from a passing statement that "no less favorably" does not mean "the same," Appellants do not address this alternative basis for the grant of summary judgment, and we may properly affirm the judgment of the trial court on this basis. See, e.g., *Crowe v. Scissom*, 365 Ga. App. 124, 141 (2) (877 SE2d 659) (2022) ("Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment."). Nevertheless, the trial court's ruling is sound.

---

[19] The midterm adjustment provisions of OCGA § 20-2-162 (a) are not referenced or incorporated in either statute.

26

Appellants acknowledged below that the State Board of Education holds the District harmless in the event that midterm enrollment declines and that the District, in turn, similarly holds non-charter schools harmless.[20] Further, there is no dispute that, for fiscal year 2021, Appellants did not hold the relevant charter schools harmless for their enrollment decreases, which resulted in reduced funding levels for those schools. Thus, the trial court properly concluded that the "no less favorably" mandate was breached when the District imposed midterm funding decreases on the charter schools following an enrollment decline where those same funding cuts were

---

[20] These factual issues were addressed by the Board in the "hold harmless" section of their "Response to [Appellees'] Statement of Undisputed Material Facts and Theories of Recovery."

not imposed on non-charter schools. Accordingly, this enumeration is without merit.[21]

Based on the foregoing, we conclude that the trial court properly determined that this matter is not barred by sovereign immunity and, further, properly granted summary judgment in favor of Appellees on Counts I, II, IV, V, and VI of the fourth amended complaint.

*Judgment affirmed. Dillard, P. J., and Rickman, J., concur.*

---

[21] In a three-sentence argument, Appellants assert that OCGA § 20-2-2068.1 (i) "provides Appellees' funding shall be based on their 'actual enrollment according to the most recent student count,'" and, thus, they argue, it follows that downward midterm adjustments to the charter schools are permissible. As we explained above, mere legal conclusions are not the type of meaningful argument contemplated by our rules," *Lundy*, 268 Ga. App. at 781 (9) (a); therefore, this argument is waived. See Court of Appeals Rule 25 (d) (1). Moreover, Appellants' argument mischaracterizes the language of the statute. The "funding" language on which Appellants rely is found in the first sentence of OCGA § 20-2-2068.1 (i), which plainly pertains to "a local charter school in the first year of operation." There is no argument that such language would be applicable to the charter schools here. While a later portion of OCGA § 20-2-2068.1 (i) does, in fact, speak to the calculation of enrollment numbers for established charter schools, Appellants make no mention of this language, and they make no effort to address whether the opening language associated with the newly-formed charter schools actually applies to language found much later in the statute concerning established charter schools; as we have said before, it is not the function of this Court to make legal arguments on behalf of litigants.

28